

**U.S. Department of Justice**

Environment and Natural Resources Division

---

*Environmental Crimes Section*
*P.O. Box 7611*
*Washington, DC 20044*

*Telephone (202) 305-0321*
*Facsimile (202) 305-0396*

October 24, 2014

Joseph A. Balter
Deputy Federal Defender
Office of the Federal Public Defender
for the District of Maryland
100 S. Charles Street, Tower II, 9th Floor
Baltimore, MD 21201

Re: George F. Estudante

Dear Mr. Balter:

This letter confirms the plea agreement which has been offered to your client George Estudante (hereinafter the "Defendant") by the Environmental Crimes Section, Environment and Natural Resources Division, United States Department of Justice (hereinafter the "United States" or the "government"). Additionally, I have attached a draft Information, together with a sealed supplement, which would be filed subsequent to any agreement. If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by November 7, 2014, it will be deemed withdrawn. The terms of the agreement are as follows:

<u>**Jurisdiction**</u>

1. The Defendant concedes that venue for the offense described in this agreement is the District of Maryland, and expressly waives all objections to venue.

<u>**Offense of Conviction**</u>

2. The Defendant agrees to waive indictment and plead guilty to a Criminal Information (Attachment A) which will be filed upon execution of this agreement and which will charge him with one count of violating the Lacey Act, 16 U.S.C. §§ 3372(d) and 3373(d). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

1

### Elements of the Offense

3. The elements of the offense to which the Defendant has agreed to plead guilty, and which the United States would prove if the case went to trial, are as follows:

    a. The Defendant submitted a false record of fish that was transported in interstate commerce;

    b. The Defendant's conduct was done knowingly; and

    c. The Defendant's conduct involved the purchase of fish with a market value greater than $350.

### Penalties

4. The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: a fine under Title 18 and imprisonment for not more than five years, or both. 16 U.S.C. § 3373(d)(3)(A)(ii). In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. The Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise.

5. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

### Waiver of Rights

6. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

    a. The Defendant would have the right to have his case presented to a Grand Jury, which would decide whether there is probable cause to return an indictment against him. By agreeing to proceed by way of an Information, he is giving up that right, and understands that the charges will be filed by the United States without the Grand Jury.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

b.  If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, the United States, and the Court all agreed.

c.  If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

d.  If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

e.  The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

f.  If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

g.  By pleading guilty, the Defendant will be giving up all of these rights. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

h.  If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

i.  By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant further understands convictions for felonies under this Agreement may subject him to administrative penalties and/or civil liability under state or federal law including, but

3

not limited to, municipal, state, and/or federal environmental and wildlife laws and regulations. The Defendant acknowledges and agrees that the criminal fines, special assessment, and any restitution do not legally bind or foreclose separate civil or administrative claims by any victims of this or other offenses. The parties agree that this agreement, and any payment under this agreement, will not constitute a settlement, waiver, or release by the United States of any civil or administrative rights or remedies it may have against the Defendant. The Defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on future administrative or civil liabilities, deportation and/or removal proceedings, and licensing. The Defendant nevertheless affirms that he wants to plead guilty regardless of any of the consequences that his plea may entail, even if the consequences avail him to administrative penalties and/or civil liabilities.

j.  By pleading guilty, the Defendant may also face adverse consequences associated with certain federal, state, and municipal licensing. The Defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on future licensing. The Defendant nevertheless affirms that he wants to plead guilty regardless of any of the consequences that his plea may entail, even if the consequences mean that he will not be able to procure certain licenses in the future.

### Advisory Sentencing Guidelines Apply

7.  The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Stipulations

8.  Factual Stipulations.

a.  The parties stipulate and agree that the facts contained in Attachment B are submitted to the Court to provide the Court with the information necessary to support the Defendant's guilty plea as required by Rule 11 of the Federal Rules of Criminal Procedure and that additional facts and information may be submitted to the Court (on notice to all parties).

b.  The Defendant admits the facts set forth in Attachment B and agrees that those facts establish guilt of the offenses charged beyond a reasonable doubt.

c.  Attachment B of this plea agreement also constitutes a stipulation of facts for the purposes of Section 1B1.2(a) and 1B1.3 of the Sentencing Guidelines. The

4

Defendant understands that the sentencing Court may make factual findings with respect to any and all sentencing factors and issues, including those referenced in the United States Sentencing Guidelines, whether or not such factors or issues have been admitted by the Defendant or stipulated by the parties.

d.  In making those findings by a preponderance of the evidence, the Court may consider any reliable evidence, including hearsay. The Defendant agrees that his sentence may be determined based upon such judicial fact-finding.

9.  U.S.S.G. Stipulations. The United States and the Defendant understand, agree and stipulate to the Information set forth in Attachment A and the Statement of Facts set forth in Attachment B, which the United States would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors:

a.  The appropriate Sentencing Guideline for Count One is U.S.S.G. § 2Q2.1.

b.  The base offense level is 6, pursuant to U.S.S.G. § 2Q2.1(a).

c.  There is a 2-level increase pursuant to § 2Q2.1(b)(1), because the offense was committed for pecuniary gain and involved a commercial purpose.

d.  There is a 6-level increase pursuant to § 2Q2.1(b)(3)(A) and § 2B1.1(b)(1)(D), because the fair-market retail value of the fish, including the scallops that form the basis of the offense and all relevant conduct, was more than $30,000 but not more than $70,000.

e.  The adjusted offense level prior to any adjustment for acceptance of responsibility is 14.

f.  The United States does not oppose a 2-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. The United States may oppose any adjustment for acceptance of responsibility if the Defendant: (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, the United States, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

g. The Defendant has no prior criminal history known to the United States for purposes of sentencing under the guidelines.

h. The total adjusted offense level is 12. The United States and the Defendant agree not to dispute the basis for this level.

i. The Defendant reserves the right to argue for a variance from the advisory sentencing guidelines pursuant to 18 U.S.C. § 3553. The United States reserves the right to object to any variance recommended by the Defendant, but agrees not to seek any upward departures or adjustments based upon information known to the United States as of the date of the execution of this agreement.

10. Restitution. The United States agrees that it will not recommend that restitution be imposed as part of sentencing. The Defendant understands that it nevertheless is within the Court's authority to impose restitution.

11. 18 U.S.C. § 3553(a) factors: The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct. If the Defendant wishes to argue for any factor that could take the sentence outside of the advisory guidelines range, he will notify the Court, the United States Probation Officer and government counsel at least 10 days in advance of sentencing of the facts or issues he intends to raise. Submitting a sentencing memorandum setting forth the request for a variant sentence and basis for the request shall constitute adequate notice under the foregoing provision.

12. Criminal Fine: The United States agrees, based upon its understanding and Defendant's representation that the Defendant does not have the ability to pay a fine, that it will not recommend that a criminal fine be imposed pursuant to 18 U.S.C. § 3571. However, if the United States' understanding is proven incorrect, the government reserves the right to recommend that a fine be imposed.

**Obligations of the United States**

13. At the time of sentencing, the United States will recommend a reasonable sentence within the sentencing guideline range. The United States agrees that the total term of imprisonment it will recommend for Count One will not exceed 12 months.

14. The Defendant acknowledges that this agreement does not bind any federal, state, or local prosecuting authority other than the United States. The Defendant acknowledges that no representations have been made to him with respect to any tax, civil, administrative, and/or licensing consequences that may result from this guilty plea.

6

## Waiver of Appeal

15. In exchange for the concessions made by the United States and the Defendant in this plea agreement, the United States and the Defendant waive their rights to appeal as follows:

    a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

    b. The Defendant and the United States knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release).

    c. Nothing in this agreement shall be construed to prevent the Defendant or the United States from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

    d. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from the United States or any investigating agency.

## Waiver of Statute of Limitations

16. The Defendant understands and agrees that should the conviction following his plea of guilty pursuant to this agreement be vacated for any reason, then any prosecution that is not time-barred as of the date of the signing of this agreement (including any indictment, information, or relevant conduct that the United States has agreed to forego prosecuting because of this agreement) may be commenced or reinstated against the Defendant, notwithstanding the expiration of the statute of limitations between the signing of this agreement and the commencement or reinstatement of such prosecution. The Defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date this plea agreement is signed.

## Obstruction or Other Violations of Law

17. This agreement only pertains to those activities identified in this agreement and Attachments A and B. The United States expressly reserves the right to prosecute any other activities involving the Defendant, regardless of their nature, that may give rise to other violations of federal law.

18. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then the United States will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, the United States will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, the United States will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because the United States is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

19. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider this agreement, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept the United States' recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

20. This letter supersedes any prior understandings, promises, or conditions between the United States and the Defendant, and constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and the United States, and none will be entered into unless in writing and signed by all parties.

8

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Sam Hirsch
Acting Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

By: _____

Joel La Bissonniere
Trial Attorney
Environmental Crimes Section
Environment and Natural Resources Division
United States Department of Justice

I have read this agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Additionally, I have reviewed Attachments A and B of this agreement with my attorney, and I do not wish to change any part of them. I am completely satisfied with the representation of my attorney.

11/25/14
Date

George F. Estudante

I am George F. Estudante's attorney. I have carefully reviewed every part of this agreement with him. He advises me that he understands and accepts its terms. To my knowledge, its decision to enter into this agreement is an informed and voluntary one.

11-26-2014
Date

Joseph A. Balter, Esquire
Deputy Federal Public Defender

9

ATTACHMENT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA     :
                                 :    **Criminal Number:** _____

        v.                        :

GEORGE F. ESTUDANTE,          :    (Lacey Act, 16 U.S.C. §§ 3372(d), 3373(d))
                                    :

       Defendant.             :

...oooOooo...

## INFORMATION

### COUNT ONE
(Lacey Act)

The Assistant Attorney General for the Environment and Natural Resources Division of the United States Department of Justice, charges:

### STATUTORY AND REGULATORY BACKGROUND

1.     Commercial fishing for Atlantic sea scallops within federal waters (generally defined as ocean waters between 3 and 200 miles offshore) is regulated by the Magnuson-Stevens Fishery Conservation and Management Act. This statute is implemented by the Secretary of Commerce, through the National Oceanic and Atmospheric Administration (NOAA). Within NOAA, these management responsibilities are carried out by the National Marine Fisheries Service (NMFS), a line office within NOAA.

2.     Under regulations published by NMFS that were in effect in 2009, certain federally-licensed commercial fishing vessels that harvested scallops from federal waters were allowed to land no more than 400 pounds of scallops (out of the shell, or commonly referred to as "shucked") per fishing trip. These regulations: (a) ensured that overall fishing did not exceed harvest quotas established for the scallop fishery; and (b) equitably allocated fishing effort among various categories of scallop fishers. To

help enforce this requirement, seafood dealers could not purchase scallops landed by any such vessel in excess of this 400 pound trip limit.

3.      To further facilitate enforcement and management, regulations published by NMFS impose reporting requirements on seafood dealers. Dealers who purchase scallops harvested from federal waters by commercial fishers must prepare and submit, on a weekly basis, detailed reports of all scallops purchased. These dealer reports must include the following information for each purchase of scallops: (a) the vessel from which the scallops were purchased; (b) the amount of scallops purchased; and (c) the price per unit. These dealer reports are used by fishery managers to monitor overall fishing effort and compliance with management requirements.

### GENERAL ALLEGATIONS

4.      At all times material to this Information:

a.      Defendant **GEORGE F. ESTUDANTE (ESTUDANTE)** was a resident of Marion, Massachusetts. He conducted business as a commercial seafood dealer under the name George Estudante dba Basic Fisheries.

b.      **ESTUDANTE** conducted business as a seafood dealer pursuant to a federal dealer permit issued to Basic Fisheries by NMFS. This permit authorized **ESTUDANTE** to purchase and sell Atlantic sea scallops that were harvested from federal waters by federally-licensed commercial fishing vessels.

c       The F/V *Miss Tamera* was a commercial fishing vessel, home-ported in Chincoteague, Virginia. The vessel possessed a federal fishing permit issued by NMFS which authorized the vessel to commercially harvest Atlantic sea scallops from federal waters. Under the terms of the vessel's license and regulations published by NMFS, the F/V *Miss Tamera* could land no more than 400 pounds of shucked scallops per fishing trip.

11

5.      On or about March 6, 2009, the F/V *Miss Tamera* intentionally landed approximately 689

pounds of Atlantic sea scallops in Chincoteague, Virginia.  These scallops, which were harvested from

federal waters, were then transported in interstate commerce to Ocean City, Maryland, by a truck driver

hired by the vessel, where they were delivered to **ESTUDANTE**.  After delivery, **ESTUDANTE**

weighed and purchased all 689 pounds of scallops.  **ESTUDANTE** paid $4,243 for the scallops by:  (a)

providing a check and invoice for 399 pounds of scallops (at a price of $7.00/lb.); and (b) paying cash

for the remaining scallops (at a price of $5.00/lb.).

### THE CHARGE

6.      On or about April 3, 2009, the defendant,

### GEORGE F. ESTUDANTE,

knowingly submitted a false record and account of fish that had been transported in interstate commerce,

which submission involved the purchase of fish with a market value greater than $350; specifically,

**ESTUDANTE** electronically submitted to NMFS a false dealer report in which **ESTUDANTE** falsely

reported that on March 6, 2009, he purchased 399 pounds of scallops from the F/V *Miss Tamera* when

in fact, as he well knew, he had purchased approximately 689 pounds of scallops with a market value of

over $4,000, all of which were transported in interstate commerce.

In violation of 16 U.S.C. §§ 3372(d) and 3373(d).

<div style="margin-left:40%">

SAM HIRSCH
Acting Assistant Attorney General
Environment and Natural Resources Division
   United States Department of Justice

</div>

By: _____

_____          JOEL LA BISSONNIERE
Date                                 Trial Attorney
                                     Environmental Crimes Section (ENRD)
                                     United States Department of Justice
                                     P.O. Box 7611

Washington, D.C. 20044
202-616-0029
Joel.Labissonniere@usdoj.gov

13

# THIS PAGE LEFT INTENTIONALLY BLANK

**ATTACHMENT B**

**STATEMENT OF FACTS**

The United States and George F. Estudante (hereinafter "the Defendant") understand, agree and stipulate to the following Statement of Facts, which the United States could prove at trial beyond a reasonable doubt:

*Regulatory Overview*

1. Commercial fishing within federal waters for Atlantic sea scallops is regulated by the Magnuson-Stevens Fishery Conservation and Management Act (Magnuson-Stevens Act). This statute is implemented by the Secretary of Commerce, through the National Oceanic and Atmospheric Administration (NOAA). Within NOAA, these management responsibilities are carried out by the National Marine Fisheries Service (NMFS), a line office within NOAA. Under regulations published by NMFS that were in effect in 2009, certain commercial fishing vessels that harvested scallops from federal waters could not harvest or land more than 400 pounds of scallops out of the shell (commonly referred to as "shucked") per fishing trip. 50 C.F.R. § 648.14(a)(57)(iii). These regulations: (a) ensured that overall fishing did not exceed harvest quotas established for the scallop fishery; and (b) equitably allocated fishing effort among various categories of scallop fishers. To help enforce this requirement, dealers could not purchase scallops that were landed in excess of this 400 pound requirement. 50 C.F.R. § 600.725(a).

2. To facilitate enforcement and management of the fishery, regulations published by NMFS impose reporting requirements on both fishing vessels and dealers engaged in fishing-related activities within the Northeast region of the United States. Dealers who purchase scallops from commercial fishers must submit detailed reports to NMFS, documenting all fish purchased or received for commercial purposes on a weekly basis. 50 C.F.R. § 648.7(a). These reports must include: a) the vessel from which the fish were purchased; b) the amount of fish purchased by species; and c) the purchase price by species. 50 C.F.R. § 648.7(a)(1)(i). Dealers file their dealer reports electronically with NMFS, through a web-based system known as the Standard Atlantic Fisheries Information System. These dealer reports are used by fishery managers to monitor overall fishing effort and compliance with management requirements.

*Estudante – Background Information*

3. At all times material, the Defendant was a commercial seafood dealer. The Defendant operated as an individual doing business under the name Basic Fisheries. From 2005 to 2012, the Defendant possessed a Federal Dealer Permit issued by NMFS. This permit, issued to "*dba* Basic Fisheries George Estudante," authorized the Defendant to operate as a commercial dealer for a variety of species harvested from federal waters including sea scallops. The Defendant operated this business by himself.

## Activities Constituting the Charged Offense

4. On March 6, 2009, the commercial fishing vessel, the F/V *Miss Tamara*, intentionally landed approximately 689 pounds of shucked Atlantic sea scallops in Chincoteague, Virginia. These scallops were harvested from federal waters during a fishing trip that began on March 4, 2009. The vessel did so while working with law enforcement authorities in an undercover capacity to assist in investigating the Defendant, who authorities suspected was purchasing illegally harvested scallops.

5. These scallops were transported to Ocean City, Maryland, by a truck driver who worked for the vessel owner, where the scallops were delivered to the Defendant at a pre-arranged location. The Defendant weighed these scallops, using a scale that he hung off the back of his refrigerated truck. The scallops, which were shucked at sea and held in fabric bags that generally contained 50-60 pounds of scallops per bag, collectively weighed approximately 689 pounds. Given the 400 pound landing limit previously discussed, the scallops exceeded what the Defendant was authorized to purchase by 289 pounds.

6. On or about March 10, 2009, the Defendant paid the owner of the F/V *Miss Tamera* for these scallops. He paid for the scallops in the following manner:

    a. The Defendant provided a representative of the vessel owner with an invoice from Basic Fisheries reporting the purchase of 399 pounds of scallops. These scallops were purchased at a price of $7.00 per pound, for a total price of $2,793. Payment was made by check, drawn on a Basic Fisheries checking account, and made payable to the owner of the F/V *Miss Tamera*.

    b. The Defendant also provided a representative of the vessel owner with cash in the amount of $1,450. This reflected payment of the 289 pounds of overage scallops, at a price of $5.00 per pound.

7. On or about April 3, 2009, the Defendant electronically submitted a dealer's report to NMFS, which reported this purchase. In his dealer's report, the Defendant only reported purchasing 399 pounds of scallops from the F/V *Miss Tamera*. The Defendant knowingly and falsely did not report the remaining 289 pounds of scallops for which he paid cash.

## Activities that Constitute Relevant Conduct

8. On eleven additional occasions between March 8, 2008, and March 29, 2009, the Defendant purchased scallops in excess of the 400 pound landing limit (overage scallops) from the F/V *Miss Tamera*, which was cooperating with law enforcement personnel in an undercover capacity. On each of these occasions: (a) the Defendant invoiced and paid for the legally harvested scallops by check; and (b) paid for the overage scallops with cash. On each occasion, the Defendant paid a lower price per pound for the overage scallops. Following each purchase, the Defendant submitted a dealer's report to NMFS, which knowingly and falsely reported that he only purchased 400 pounds of scallops from the vessel. These purchases and the manner in which they were reported can be summarized as follows:

| F/V Miss Tamera | | | | | | |
| Trip | Date Landed | Scallops Landed | Overage | Scallops Purchased | | Scallops Reported to NMFS |
| | | | | Legal Scallops | Overage Scallops[2] | |
| 2 | 3/8/09 | 488 | 88 | 400 @ $6.10/lb. | 83 @ 4.50/lb | 400 |
| 3 | 3/11/09 | 720 | 320 | 400 @ $5.95/lb. | 761 @ $4.00/lb. | 400 |
| 4 | 3/14/09 | 855 | 455 | 400 @ $5.95/lb. | | |
| 5 | 3/15/09 | 658 | 258 | 400 @ $6.00/lb. | 714 @ 4.00/lb. | 400 |
| 6 | 3/19/09 | 583 | 183 | 400 @ $6.00/lb. | | 400 |
| 7 | 3/20/09 | 677 | 277 | 400 @ $6.00/lb. | | 400 |
| 8 | 3/22/09 | 674 | 274 | 400 @ $5.50/lb. | 1200 @ $4.00/lb. | 400 |
| 9 | 3/25/09 | 756 | 356 | 188 @ $6.95/lb[3]. 212 @ $5.50/lb | | 188 212 |
| 10 | 3/26/09 | 698 | ·298 | 109 @ $6.75/lb. 291 @ $5.50/lb. | | 109 291 |
| 11 | 3/28/09 | 735 | 335 | 22 @ $6.75/lb. 378 @ $5.50/lb. | | 22 378 |
| 12 | 3/29/09 | 565 | 165 | 400 @ $6.75/lb. | | 400 |

9. During this same time frame, the Defendant also purchased overage scallops on three separate occasions from a second vessel, the F/V *Lady Annie*. Unlike the F/V *Miss Tamera*, this vessel was not working with law enforcement personnel in an undercover capacity. On each of these occasions: (a) the Defendant invoiced and paid for the legally harvested scallops by check; and (b) paid for the overage scallops with cash. On each occasion, the Defendant paid a lower price per pound for the overage scallops. Following each purchase, the Defendant submitted a dealer's report to NMFS, which knowingly and falsely reported that he only purchased 400 pounds of scallops from the vessel. These purchases and the manner in which they were reported can be summarized as follows:

| F/V Lady Annie | | | | | | |
| Trip | Date Landed | Scallops Landed (NMFS Total) | Overage | Scallops Purchased | | Scallops Reported to NMFS |
| | | | | Legal Scallops | Overage Scallops | |
| 1 | 3/25/09 | 554 | 154 | 400 @ $5.50/lb | 300 @ $4.00/lb | 400 |
| 2 | 3/28/09 | 467 | 67 | 400 @ $5.50/lb | | 400 |
| 3 | 3/29/09 | 497 | 97 | 400 @ $5.50/lb | | 400 |

*End of Attachment B*

---

[2] Cash for overage scallops was not paid following each delivery. On occasion it was paid at the end of several trips.

[3] On certain occasions, the Defendant paid a higher price per pound for larger scallops. This was reflected on both the invoice and dealer report.